## WELSH *v.* COOPER.

8 217
[39SC 187

All persons who order or procure a trespass to be committed, and indemnify others for doing it, or incite them to do it, may be sued as principals.

One, who directed the act complained of as a trespass to be done, adopted it, and bound himself to be responsible for it: *Held*, that he was a party in the tres-

pass, if one were committed, and that he could not be compelled to testify for the plaintiff, although not joined in the suit, because his testimony would have gone to establish his own liability as a party; but his declarations, when against his interest, are evidence in a suit against his co-trespasser, and it is error to reject them.

The books of a party who sues the sheriff for levying upon and selling his goods, under an execution against another, are evidence for such party: not on the principle under which shop-books are generally admitted, but as part of the *res gesta*, tending to show the nature of the plaintiff's possession of the property in controversy. The books, in such case and for such purpose, are no more objectionable on the ground of being evidence made by the plaintiff for himself, than proof would be, that the plaintiff had sold goods, received the money for them, &c., which would certainly be evidence.

IN error from the Court of Common Pleas of Perry county.

*May* 31. This was an action of trespass *de bonis asportatis*, brought by Elizabeth Welsh against Henry Cooper, sheriff of Perry county, to recover damages for levying upon and selling a store of dry goods, groceries, &c., seized and taken in execution by him, by virtue of a writ of *fieri facias* against James Welsh. The plaintiff claimed the goods as her property.

At the trial, before HEPBURN, P. J., the plaintiff called and examined Andrew Welsh, her brother, as a witness. He testified, in substance, that he was clerk in the store, under an arrangement with his sister, the plaintiff, to keep the store for her one year, for one-third of the clear profits, he to suffer no part of the losses; that under this arrangement he went into the store on or about the 1st of April, 1846, took possession of the goods for his sister, and kept and attended to the store until the 4th of July following; that the plaintiff lived in the house in which the store was; that she attended to the store when he was out on business, and assisted him when business was throng; that they kept an account of every article got or taken by either of them from the store for their own use, also an account of the sales, and all moneys expended for produce; all the accounts entered and kept in her books and in her name; that on the 30th of April, 1846, the plaintiff went to Philadelphia to buy goods, and returned in May with bills amounting to about $1,000; that the goods came up shortly after her return, and that a large portion of these goods were levied upon by Sheriff Cooper, the defendant. He also testified that an inventory of the goods in the store was taken by him and another, before he went in as clerk; that he had no interest in the store beyond what he was to receive for his services; and that the store belonged to his sister, so far as he knew. The plaintiff then read the depositions of twelve Philadelphia merchants, which proved that the goods were sold to Eliza-

beth Welsh alone, and that the deponents knew nothing of James Welsh.

A bond of indemnity was then read, given by Jacob Weibley and William Power to Sheriff Cooper, the defendant, with William Weibley and Henry Snyder as sureties, in the penalty of $2,000, in the usual form, indemnifying the defendant against all actions, damages, costs, &c., by reason of selling under the direction of said Jacob Weibley and William Power, any goods as the property of James Welsh. They were the bail of James Welsh to the Carlisle Bank.

Articles of agreement between James Welsh and Wilson Welsh, for the sale of the Bridgeport store, the store in question, from Wilson to James, dated 30th November, 1838, were read.

William J. Graham was then called and sworn: "I am the subscribing witness to that agreement; I have had possession of it since the agreement was signed; it was signed in Philadelphia. James Welsh went into possession of the property and store in the fall of 1838; there was an inventory taken of the store, and James took possession; there has been a store kept up in that house from that time until the sheriff's sale. The store, from 1838 until 1842, went in the name of James Welsh; in June, 1842, or about it, there was said to be a sale of James's interest to Elias Kosier; he died in April, 1843; Jacob Kosier and James Welsh were his administrators; after his death, the store was kept open for near a year; they got recruits of goods at different times; I have known them to get groceries. In the spring of 1844, there was a sale made of the store to Hannah Welsh. Elizabeth Welsh told me, that after some time she would have the store in her own hands; this was shortly after the sale by the executors; after that some time, she said she was now doing business for herself."

The defendant then gave in evidence a writ of *fieri facias*, issued at the suit of the Carlisle Bank, against James Welsh; under which Sheriff Cooper, the defendant, levied upon the store goods, in the store-room of Elizabeth Welsh, the plaintiff, as the property of James Welsh, and sold the same for $1,107.29. The defendant also gave in evidence a large number of judgments and executions against James Welsh, and sales of his real and personal estate by the sheriff, in 1843–4–5; and also the separate acts, declarations, and conduct of James Welsh, to prove that the store was his.

The plaintiff then gave in evidence, all the bills of the goods purchased by Elizabeth Welsh, the plaintiff, from the spring of 1844, to the time of the sheriff's sale; also the will of Elias Kosier,

proved in 1843; letters of administration to James Welsh and Jacob Kosier, and the inventory of Kosier's estate, consisting of store goods, and amounting to $2,100.

The plaintiff then offered in evidence, the declarations of Jacob Weibley, in reference to the goods levied upon by the sheriff. The court rejected the evidence, and sealed a *bill of exceptions.*

A witness was then called, who testified, that he had dealings at the store, in 1845 and 1846; that he gave the plaintiff two notes, to be paid in Philadelphia; that she had no partner, so far as the witness knew, and that orders were given in her name.

Another witness testified, that in May, 1846, he lent the plaintiff $60, to purchase goods in Philadelphia; that she paid him a part of it, and that James Welsh never said anything to him about it.

Defendant then called several witnesses, who testified, that the character of Andrew Welsh, the witness first examined, for truth, was not good. He then called John Shively, who testified as follows:—

"Andrew and I took the inventory, when Andrew went to keep store for his sister; it was at the time he went into the store; it was in the spring. There never was a calculation made of it; it was not counted up; I cannot tell what it would amount to. I clerked in the store shortly after the administrators sold it; I kept the store for Hannah Welsh about three months; she asked me to become a partner with her. Elizabeth told me she was going to own the store herself; that she would be doing business there herself, and wanted me to become a partner. The books of Elizabeth were not the same books kept by Hannah."

Plaintiff offered her own books, commencing in March, 1844, and ending in July, 1846, for the purpose of showing that this business was done exclusively in the name of Elizabeth Welsh, and for the purpose of corroborating the testimony of Andrew Welsh, who kept the books, and for every other legitimate purpose. Objected to and rejected by the court, who sealed plaintiff's *second bill of exception.*

The rejection by the court of the declarations of Jacob Weibley and the books of the plaintiff, offered in evidence by the plaintiff, were the errors assigned here.

*Watts,* for plaintiff in error. — The question tried by the court and jury was the ownership of the goods which had been levied and sold by the sheriff. They composed a store which had

been kept by the plaintiff for two years. Andrew Welsh, the witness, had been the clerk in that store. His character for truth had been attacked. The evidence of the books of entry kept in that store, and by the witness, should have been received, for two purposes : to show the manner in which the business had been done and conducted, by whom the goods had been purchased, and by whom sold ; and they were clearly evidence to corroborate the testimony of the witness whose veracity had been attacked. But that they were evidence, we think is expressly settled in the case of Welch v. Speakman, 8 W. & S. 257.

*Graham* and *Reed*, contrà.—Were the books kept by Elizabeth Welsh ? Evidence to prove that she owned the store. Books kept by a tenant are not evidence to show the relation which existed between landlord and tenant, being offered by the landlord to show that the tenant was his agent and not his tenant : Townsend v. Kerns, 2 Watts, 180. Books of original entries are *primâ facie* evidence of sale and delivery of goods from necessity, but cannot be admitted as evidence of a collateral matter in which a third party is concerned : Juniata Bank v. Brown, 5 S. & R. 231 ; Bovard v. Wallace, 4 S. & R. 499 ; Nussear v. Arnold, 13 S. & R. 323.

*June 9.* Coulter, J.—Jacob Weibley was the principal in the bond by which the defendant was indemnified for levying on the store in question. The return to the execution is a "levy on store goods in the store-room of Elizabeth Welsh," and the indemnity was for selling any goods under the direction of the said Jacob Weibley and William Power, as the property of James Welsh. The store in question was found in the possession of Elizabeth Welsh, and sold under this indemnity. If any trespass was committed, Jacob Weibley was a principal in that trespass, and equally answerable to the plaintiff. All persons who order or procure a trespass to be committed, and indemnify others for doing it, or incite them to do it, may be sued as principals. Jacob Weibley having directed the act in this case, adopted it, and bound himself to be responsible for it, was a party in the trespass, if a trespass was committed : and that is the very issue which was to be tried in this suit. Now, although he was not joined in the suit, the plaintiff could not have compelled him to testify, as it would have gone to establish his own liability as a party. His declarations, therefore, were evidence when against his interest. This point was ruled in Harriman v. Brown, 8 Leigh, 697, where it was resolved,

that the admissions of a person who could not be compelled to testify, and whose declarations are against his own interest, ought to be received. It is not necessary that the person in interest should be actually a party on the record, as was resolved in Pike v. Wiggin, 8 N. H. 356. The evidence offered of the declarations of Jacob Weibley ought to have been received.

The books of Elizabeth Welsh, which were rejected by the court below, ought also to have been received in evidence: not, to be sure, on the principle on which shop-books are generally admitted; nor to accomplish the object for which they are held to be full *primâ facie* evidence, when accompanied with the suppletory oath of the party; but as part of the *res gesta*, or transactions under which the possession of the store and ownership of the goods in question was to be developed or made manifest. It is no objection whatever, to say that Elizabeth Welsh would thus make evidence in her own behalf. No one would pretend that it was not competent to give evidence that Elizabeth was constantly in the store, claimed the goods as her own, sold them as her own, and received the money or credited them as her own, and entered them in her books: yet these were all acts done by herself. A man's exclusive possession of personal property is his own act, either by himself or his agent, and is often established by a variety of circumstances. The books of the store were the best evidence of the manner in which the business was conducted. They afforded daily record of the business, and were offered in evidence for the purpose of establishing that they were kept in the name of Elizabeth Welsh. It was ruled in 8 W. 257, that the son might show the course and manner of doing business at the store before the controversy: as that the sign was in the name of the son, and bills made out in the same way, and suits brought in his name, and that the books were evidence. What importance the evidence might hold in the settlement of the cause, is not for us to say; but the books conduced, in some degree, to prove what it was necessary for the plaintiff to establish, to wit, that she had purchased the store, had received, taken, and maintained exclusive possession of it, and managed and sold the goods as her own. The evidence was also offered to corroborate the testimony of Andrew Welsh, which had been impeached; who swore that the business was done exclusively in the name of Elizabeth Welsh, and that the books were kept in her name. The exhibition of the books, to a certain extent, would, therefore, either corroborate or contradict him. These books, like all others, would be subject to the inspection of the court and jury; and their value

would depend upon their appearance, and the internal evidence they would afford of their being contemporaneous with the facts they recorded.

We may regret being obliged to reverse a judgment for the exclusion of testimony, the weight of which in the cause it is not our province to determine. But we must maintain the rules of evidence ; and as the rejected testimony might legitimately, with the other facts in evidence, conduce to prove the issue on the part of the plaintiff, he must have the benefit of it. All may be overcome by evidence satisfactory to the jury that the sale was covinous, and intended to hinder, delay, or defraud creditors.

Judgment reversed, and a *venire de novo* awarded.